Good morning, Your Honors. May it please the Court, Sussan Alvanyan on behalf of Petitioner Vahan Khachatryan. Your Honors, in this case, there are a bunch of alleged inconsistencies that the I.J. pointed out, which I'd be willing to address any of those individually, but just as a general matter, this is a pre-Real ID Act case, and the I.J. in this case mentioned several inconsistencies that he thought were inconsistencies, and I'd like to start off with some of the important ones. He mentioned that the political views were vague, which is something the BIA brought up as well. Many times, as we know, here in the United States or in Armenia especially, people can espouse a very strong support for a party or a candidate and yet not know the exact details of the platform of that party and so forth. And in this case, the individual stated that it was the only party fighting for the people's interests, that this was the only party talking, and I'm quoting from the transcript. He claimed to have organized a separate committee and to be the president of it. And giving speeches, I think. He gave speeches. That's correct, but the youth committee, I believe he stated, was more to, and I'm reading from the youth committee's platform, to encourage the education of youths and so forth. So why couldn't he be more specific? Why was the I.J. wrong in finding that that was a significant inconsistency? Well, he stated that basically he supported Garyan Demirjian, who was assassinated at the October 27th parliamentary shooting, and he strongly supported his ideas and the goals of that party. The I.J. never further prodded for more details in this case and It seemed to me like the I.J. gave him a really fair shot at saying, I really need to know, I need to understand what these words. So to say I support the goals of the party but not to be able to explain what any of those goals are, I have a problem with that. So I want to make sure I give you an opportunity to tell me why I'm wrong. Your Honor, basically the I.J. in this case stated that he asked only, he asked what were your views and then he asked one more time. He said, basically, was that it? So government counsel obviously didn't even have to file, didn't ask any follow-up questions. Respondents' counsel, if I were the attorney I would have asked more detailed questions, but he was not asked more detailed questions to follow up. He did indicate that he supported Demirjian, the PPA, and under Soto Olarte, the I.J. should have indicated why the answers were not acceptable. Why, I mean, basically different people have different knowledge. He could have been talking only about education of youths and the protection of people's rights. He even stated that he was trying to do more for the people and so they can live better. I understand it may seem overbroad. Usually if somebody runs an organization, it can tell you something about what it does other than generalities. Like, you know, we had classes for children and so many children came to the classes and we were training them to do something and none of that is there. What about, what about the claim that he'd been appointed by the U.N. to be an election observer? There were inconsistencies there as well that the I.J. was troubled by. Yes, Your Honor, with regard to that, actually he was asked, he mentioned the U.N. initially, but he was asked which agency gave you the observer card. He mentioned the CEC, the Central Election Committee in Armenia, so he cleared that up. Later on he indicated that year the U.N. was observing the elections or overseeing the elections. So he cleared up. Basically his understanding was that since the U.N. and I've done probably hundreds of Armenian asylum cases, so I know the individuals are often confused about this issue, even if they have been. Forgive me, I didn't mean to interrupt you. You were saying you've represented hundreds and please finish your sentence. Yeah, basically, Your Honor, in this case, because the U.N. was observing the elections and overseeing the elections and he was an observer in the election, he later cleared up what he meant by that. Well, see, I thought that he later made it fuzzier because he, in the course of trying to answer the questions, I think he then said that it was the mayor's office that asked him to oversee the elections and not the U.N. at all. That's correct. And he indicated that the Central Election Committee in Armenia is the one that issues the card. And he did clear up immediately as soon as he was asked that it was not the United Nations. That is correct. He did immediately... And how does one make that mistake? How does one say that the U.N. appointed me and then say it wasn't the U.N. at all? Well, he basically said, I mean, what he said, Your Honor, and then he was asked, why did you say that? And he clarified that because the U.N. had observers and they were observing, overseeing the election. He was an observer. That was his understanding. I mean, he was asked for an explanation and he did explain it. He wasn't trying to... And what happened interestingly, actually, Your Honor, is the I.G. said you have proof that the U.N. He said more than that. In his original application, he said, during the May 1999 Parliament, I was appointed by United Nations to observe the elections as an international monitor. So he didn't just, he didn't say that he was, you know, a local person who was operating under an election. He said he was an international monitor, which is what I'm saying. And, Your Honor, if his intent was to pursue that or he was trying to be dishonest in any way, the next question, if I may quote from the transcript on page 111 is... I was reading from the original application. Then when he was... Go ahead. Oh, he was asked, where does it say anything? The judge asked, do you have a document to show that you're an observer? And he doesn't even hesitate. He says, yes, here it is. And he shows the central election card document. So he was obviously confused. He wasn't trying to pursue the fact that he was an international observer. He wouldn't have said, yes, here's the document, which clearly does not show that he was a U.N. observer. Was he your client at that time? He was not, Your Honor. Yeah, I didn't even do the BIA. I did the Ninth Circuit briefing. So, and, Your Honor, with regard to... I have a feeling that he's kind of like Forrest Gump. He was like everywhere. That's correct. And I honestly... He happened to be there when there was an assassination. He happened to have... And, Your Honor, I didn't have a chance to check, and I don't want to take the time right now, but I'll check his education level. A lot of times these individuals don't have the highest education level. Your Honor, but some of the other inconsistencies that were quoted with regard to the accent, for example, he indicated that from the accent they stated that it was the President's men, and there's a pretty important indiscernible there in the transcript. So I think he cleared up that issue regarding the accent. Regarding the medical record, Your Honor, the judge, for some reason... Does that make sense? I mean, because they happened to be from some region, that meant that they were the President's men? Yes. Well, basically, there aren't too many Azeris or individuals from Karabakh in mainland Armenia, and the President, Kocharyan, and even the current President, Sargsyan, are from Karabakh. So, but he later qualified in that same sentence that they indicated they were the President's men. With regard to corroboration, I mean, I could see the IJ being confused about some aspects in asking for corroboration, but to dismiss all of the corroboration that is available in the case regarding the beating and the cranial trauma versus a concussion, the IJ harped on that. Well, that was weird. Yeah. And I agree with you on that. And also the exit wound. I don't know why the IJ dismissed penetrating exit and entry wound versus a gunshot. Both of those things do seem corroborative. Yeah. And the political activities. He has the membership cards, which were never refuted. Counsel, your time is running out. Could you speak for a minute about the forgery conviction? Yes, Your Honor. Actually, Your Honor, in that case, and I would like to differentiate from the UNUWAKULU, if I'm quoting it correctly, basically, Your Honor, he was asked... There's no, first of all, conviction record in the case, so we don't even know. We have his testimony. Correct. And he was asked, have you ever been arrested out of nowhere? And he stated, yes, I have. He never tried to deny that. Actually, what I have in my notes is that at 238 in the record, he was asked if he had been convicted, and he said, quote, no. They couldn't prove that it was me, so the judge gave me three years probation. The IJ asked him if he pled guilty, and he said, yes, I did plead guilty. That's why the court was lenient. And then he explained, quote, somebody had extorted a lot of money from my bank, so that's why they arrested me to find out if it was me. So he's not denying that he was convicted. Correct. Even in 237, he says, have you ever been arrested in the U.S.? He says, yes. And a lot of people try to sugarcoat it or deny it. He said, yes, I have. And then they go on to, have you ever been convicted? Yes, I have. Well, he says, no. But then he did say he pled guilty, which in a lot of people's minds may not be equal to a conviction. They couldn't prove that it was me, so the judge gave me three years probation. Correct, which essentially is admitting the conviction. And in Unua Halu, it was an aggravated felony. It was an 18-month sentence. It went to a trial, I believe, in that case. And the IJ required corroboration in that case because of that. And in this case, he did provide corroboration for some of the inconsistencies. It's not necessarily the forgery conviction that I find so important, although that's certainly a crime involving dishonesty. But this testimony at the hearing strikes me as not exactly forthcoming. Quite the contrary. And so I wanted to give you an opportunity if you wanted to address it. Yes, Your Honor. You mean regarding the conviction? Right. Well, Your Honor, regarding the conviction, he again states, yes, I was arrested. Were you convicted? They couldn't prove, no, they couldn't prove that it was me, so the judge gave me three years probation. So we don't have the record again. It could have been a no contest. And I've had clients tell me, no, I was not convicted. I was not found guilty. It was a no contest plea, thinking that that's not a conviction. Where did this happen? Where did it happen? In this country, right? What court? Correct. But it's not even clear from the transcript. What court, where, what happened? I mean... Well, why don't you look it up? We can't. There's no conviction record in the whole transcript. That's the odd thing. The government never served the record. He admitted it openly, and he didn't even deny it. He could have said, no, there was no record. Where was he? Where did this take place? What part of the world? In the United States, Your Honor. Where? Well, it's not in the record. It's not anywhere in the record. Nobody asks him where was it, which court house. Well, you could ask your client. Sure. Where did it happen? Yes. And since he's resided only in California, I assume it was in a California court, superior court. So, but... Well, you could ask him where did it happen, and it's easy to check. Yes. Yeah. I could check that. But you didn't do that. I did not, Your Honor, because it was already at a point where it was... Well, I mean, I think you'd be curious about that. Yeah. You know, anyway, his wife and his whole family is still in Armenia. That's correct, but they're not similarly situated because none of them participated in politics. And this circuit court's case law is that they have to be similarly situated. And basically, Your Honor, with regard to the incident that I would like to discuss is the I.J. mentioned that February 19 incident regarding the grazing, whether the shooting, there was a grazing or there were wounds, and he indicated that it was just a, basically, it was a grazing. They were not wounded. And a lot of this does, honestly, I mean, obviously there's no evidence in the record, but it does get lost in translation what a wound was translated as. That's why I wish I was the attorney at the courthouse, but I cannot. So basically, at this point, we would argue that a lot of the inconsistencies under pre-Real ID Act standards were minor or that he was not given a sufficient opportunity to explain. The most important one, I think, is under SOTO-Alarte. There's a case where he indicates that the I.J. cites to the 2003 country report, which, and I apologize, Your Honor, I know over the time, but I'll finish with this, that it was in the 2003 country report that four or five districts or three districts had an election. But I read that country report. I went and looked it up last night, and it does say that two other districts also had a recount because of constitutional, the constitutional court ordered recounts. It's not clear if any other districts had it, even though it's not in the country report. So that doesn't mean that the medical report and that is an inconsistency. The least he could have done is under SOTO-Alarte, ask them for an explanation. Why does the country report say this, and you're saying this? So there's a lot of issues here that I think would be appropriate under a remand. So thank you, Your Honor. Your Honor, may it please the Court, my name is Samuel Goh, again, and I represent the U.S. Attorney General in this matter. Your Honor, the record is not a compel reversal of the agency to address credibility determination. From the record, and this is based on there are numerous cases in which the agency's credibility determination  and there are numerous inconsistencies that go to the heart of Petitioner's claim, which is that he was persecuted in the past based on his political opinion. From the record, we don't know if Petitioner was kicked or struck by or just talked with three men when they visited Petitioner a week after the May 30th, 1999 elections. We don't know which body part was purportedly shot because he testified and stated at different times that he was shot in the foot, in the left leg, and then in the right ankle. And we don't know where he was shot because he also gave three different answers for that. First, he said that he was outside the store, the pharmacy. Then he said that he was between the pharmacy and the youth office. And then he said he changed his testimony again to say that he was inside the drugstore. And along those lines, we also don't even know whether or not he knew the people that purportedly shot him. He first states that he didn't know the people, and then he identifies specific names as to who shot him. With regards to an incident when two men visited him at the pharmacy for his audits, we don't know when it happened because in his narrative statement, he says that it happened soon after he visited Manzal Ghazarian and Sam Valvardanyan, which was in February 2001. However, in his hearing testimony, he actually states that it happened in summer of 2002. With regards to the identity of those two men, he states in his narrative statement that one of them was a presidential security guard, but then in his hearing, he says he didn't recognize him. And finally, he also says that he either just had a conversation or nothing happened, and nothing happened, or the two men threw medications down, kicked him, and struck him, ruined his door, and warned him not to forget he had a family. These are all things that form the basis. Did one of them hit him on the head? We don't know, Your Honor, because according to, I believe, his... You have this medical report that refers to him and that he, on 6-10-2003, was diagnosed with residual phenomena, cranial trauma. Yes, Your Honor. I understand that's also in the record as well. There's also testimony that he said he suffered a brain concussion. These are all different things where when you look at... I don't know. A cranial trauma and a brain concussion aren't necessarily different things. They could easily be different words for the same thing. Your Honor, I think when you take into totality the... Well, I understand that, but I did think that discrediting that piece and the part about the wound, I mean, the wound was a wound, and it seemed to be a wound by a gun. It was an entrance and an exit.  Yes, Your Honor. In case it's helpful feedback, I had the same reaction as Judge Berzon. To me, those records reinforce what the petitioner was saying, that he had suffered those injuries. Your Honor, it shows that he suffered an injury. It doesn't show... It wasn't definitively from the medical records whether it was a gunshot wound, and it doesn't show where, when, or how. It was a point of entry and a point of exit, and he said he was shot in the ankle. Your Honor, he said different things at different times. And actually, the medical report says that it was the left ankle, which is what he didn't say. Could you give me the citations to the record where he identified different parts of his body that were shot? Sure, Your Honor. Thank you. He says he was shot in the left leg, and that is in Administrative Record 162. 162, okay. He testifies that he was hit in the ankle. That is 228, and said it was the right ankle, and that was 227. Okay. And when he says that he was hit in the foot, that is 320. Thank you. So, Your Honor, when he's making this asylum claim, that he has suffered persecution based on his political opinion, and he cites these incidents, but there are major inconsistencies. I believe the government's position is that these are major inconsistencies, whether he was beaten up or had a conversation, and whether he knew the people that had shot him or beaten him up versus not knowing the people. Opposing counsel makes the point somewhere in his brief that there were actually two different visits to the pharmacy, and I got lost in trying to unravel whether or not the problem was that the IJ misunderstood that there were actually two different visits to the pharmacy by the three men. Clearly, he says at one point that they wrecked his pharmacy, threw stuff on the floor, and then the other account is that they basically came there and threatened him, trying to shake him down for money and left without any violence. Were there two instances? Not according to the testament petitioner. And in the transcript, the immigration judge actually does try to address and ask the petitioner to explain the inconsistency between the narrative statement and his testimony. That is in AR 229 to 230. And all he says, he was hit while he was running, and the bullet hit him from behind.  And is your take on the testimony that there was just one visit by three men to the pharmacy on one occasion? Your Honor, my understanding, and what is garnered from the record, is that there was one visit a week after the May 30th, 1999 elections by three men. Okay. That's what you think the evidence is. That was an incident that he based his asylum claim on. I think there was one time when they came and they either talked to him or had to erect a place, and another time they came and they shot him. I think that he also generally talks that, you know, they had come to his pharmacy. So there was more than one visit? Your Honor, yes, but at the same time, he's talking about this – he talks specifically about this particular visit a week after the elections. These two visits, one when they came – there was one visit when they came and either just talked to him or threw all the bullets on the ground, and there was another time they came and they had a fight and they shot him. Your Honor, I believe the record shows that there was one incident with three men talking to him, and then he also says just kind of generally that, you know, he was visited. It looks like one – I thought there was one in 1999 and one in 2001, in case that illuminates anything for you. That's how it looked to me. Yes, there's an incident June 6, 1999 with three men, and then the pharmacy audit where there were two men that visited him, and we don't know the exact date because he gave two different answers, either soon after February 2001 or the summer of 2002. And, Your Honor, just to also point out, with regards to the inconsistencies with that incident, the June 6, 1999 incident, the immigration judge asked the petitioner to address his inconsistency and why he didn't mention this in his narrative statement, and he just said that he was hit and struck. He asked what date it happened, and he said June 6, 1999. So there's a specific question and answer there where he gives the particular date in which this happened, and now we have two different stories from the petitioner. Your Honor, I'd be happy to go into greater detail about any other inconsistencies if the Court wishes. I'd also like to talk – mention – so he does testify that he gave three or four speeches at rallies at the Armenian Popular Party, but at the same time when he was asked, what did you say at those speeches, he couldn't give – he couldn't cite any specific detail. And this is not just a specific view of the Armenian Popular Party or just an issue that he disagrees with the opposing party. He couldn't give any specifics at all. All he said was that he was fighting for the people, this was a party fighting for the people. And I think that that is striking because if you're giving speeches, you are taking certain positions and not – Well, that may not be true. Well, you know, politicians get up and give speeches and, you know, when they get through, they're not sure what they said. Your Honor, I think that it's striking that he could not actually even say what part of a speech that he said. Well, he talked about the subject, that he was convincing people that this particular party should be supported because they were for the people. And when he was asked – yes, Your Honor – and when he was asked to elaborate on that, he could not. And when he – at the same time he's talking about how he's being persecuted for his political views and sharing those political views, he couldn't espouse or articulate any specific issue or detail about his political views. All he could say was, you know, this is a party fighting for the people. And when the immigration judge pressed him further, he just said – What's wrong with that? He likes a party that's fighting for the people. Your Honor, there's nothing wrong with that, but it needs to be in addition to what – why does he think that it's – this party fights for the people. What is so wrong about the opposing party? Well, did the IJ ask him any questions as pointed as that? What page – I don't think so. What page in the transcript do I look at? I think he certainly gave him an indication this was important. I need more detail. Yes. It is AR-132. I'll go look again. Thank you. The judge – when he said that the Armenian Popular Party is the only party fighting for people's interests, the judge asked, just fighting for people's interests? And so he was pressing that way. And the petitioner replied – Didn't he say at one point, this is – I need to really understand, I need more? Didn't he call his attention to it? I think generally because this is all within the testimony that's given between AR-132 and AR-145. Okay. And also – That's fine. I'll go back and check it again. I've read it, but – Besides speeches and political views, he says he's chaired a youth social committee, but when he was asked what does that youth social committee do, he couldn't give any specifics as to what their function is. And you would think that that would be something that would be expected from someone that's chairing the youth committee. There are inherently improbable testimony that is also in our brief as well regarding the youth social committee. In particular, he said that they were to help monitor the elections. And then it was brought up during the testimony that they could actually not go into the polling stations because they were not old enough. And so he explained that they were outside checking to make sure that the elections ran properly. And when asked for that, he – They were probably out there checking their driver's license or their passport, the way we do here. Your Honor, we don't know. It wasn't specified. All we know is that when he was questioned about that detail, he added some things that didn't seem to make sense. Your Honor, so it's the government's position that based on these inconsistencies and the vague and general testimony, that the adverse credibility determination was proper and that the petitioner's petition preview should be denied. Thank you. Thank you very much. We'll give you one minute. Thank you, Your Honor. Yeah. I appreciate it. Your Honor, you asked an important question. I think where it says – where does the judge – and I went back and looked at it. In fact, there is a question as to more detail. And the judge does not give him an opportunity. It's on page 132. That was the only party, according to my view, that was fighting for the people's interest. Just fighting for the people's interest, in my opinion. And that's it. There's no follow-up question. Was there one incident or two at the pharmacy? At the pharmacy, Your Honor, there was two incidents. Actually, at least two. That's another thing. He says they came multiple times and threatened me. So it could have been more pushing around or throwing – I mean, they only asked about two of the incidents in detail, but he says they came multiple times to the pharmacy in 2002 for the audits and also in 1999. Now, the I.J. himself says in his oral decision he may have been confused as to the first and the second incident, which is very possible, and the I.J. does attribute to that. I realize I'm over my time, and I do appreciate the extra time, Your Honor. Thank you. Thank you. This matter is submitted. We'll come to the third item. Justin Ringgold Lockhart and Nina Ringgold v. County of Los Angeles.
judges: Pregerson, Berzon, Christen